WILLIAM A. RAFTER, Respondent, v. RICHARD K. FOX PUBLISHING COMPANY, Appellant.

Second Department, October 11, 1923.

Master and servant — action for wrongful discharge — defenses of ultra vires and termination of contract for cause — fact that owner of corporation acted individually does not make contract ultra vires — evidence shows that discharge was wrongful — contract of employment for life not void.

In an action against a corporation to recover damages for wrongful discharge, the defense of *ultra vires* is not shown by proof that the contract was made by the owner of all but two shares of the capital stock of the corporation in his individual name, where it appears that the affairs of the corporation had always been managed and conducted by that person under his individual name and not under the name of the corporation.

The evidence establishes that the plaintiff who was engaged for life in the capacity of editor and general manager of a paper published by the defendant, was arbitrarily and wrongfully discharged without cause, and that the plaintiff at all times fully performed his duties as editor and manager and did his work so well that the paper, which was practically insolvent when he took charge, was at the time of his discharge by the defendant in a flourishing condition.

A contract of employment for life is not void as against public policy.

APPEAL by the defendant, Richard K. Fox Publishing Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 11th day of May, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 12th day of May, 1922, denying defendant's motion for a new trial made upon the minutes, with notice of intention to bring up for review an order entered in said clerk's office on the 11th day of May, 1922, granting plaintiff an extra allowance.

*Francis E. Neagle* [*Ralph S. Rounds* and *Eugene Congleton* with him on the brief], for the appellant.

*Hersey Egginton* [*Albert Conway* and *Alvah W. Burlingame, Jr.,* with him on the brief], for the respondent.

MANNING, J.:

The action was brought by the plaintiff to recover the sum of $600,000 from the defendant by reason of its alleged breach of a contract of employment dated October 3, 1919, pursuant to the terms of which contract the defendant employed the plaintiff, and the plaintiff undertook to serve the defendant, in the capacity of an editor and general manager, for the term of his, plaintiff's, natural life, in the publication of a weekly sporting paper owned by the defendant, and known as the *National Police Gazette.* The result of the trial was a verdict in favor of the plaintiff for the sum of $200,000, and from the judgment entered thereon the present appeal is taken.

The plaintiff, in his complaint, pleaded the contract, alleged the performance of his duties under it up to the time when, he asserted, he was, without cause, discharged by the defendant, and hence suffered the damages sued for.

The defendant pleaded a general denial; also that the contract was *ultra vires;* further that it had been obtained by misrepresentations and undue influence; and further that the plaintiff's employment was duly terminated for cause. The only basis for the defense of *ultra vires,* advanced by the defendant, was its claim that the contract referred to was made by Richard K. Fox, and that it was his individual act and obligation, rather than the act of the corporation. There is no force in this contention. It is undisputed that at the time the contract under consideration was made between the plaintiff and the defendant's president, Richard K. Fox, Fox owned outright 998 shares of the company's outstanding 1,000 shares, and that he also beneficially owned and controlled the remaining two shares, one of which stood in the name of his son, and the other in the name of an employee of the defendant company. Neither of these persons had ever paid anything for the shares of stock held in their names, and merely held these shares in order to qualify them as directors of the concern under the orders of Richard K. Fox. The proof is ample that the corporation itself was nothing more or less than a paper company, of which Richard K. Fox, individually, was the real owner. It was shown by undisputed evidence that for years this corporation had no corporate bank account; that it paid no dividends; that all salaries and corporate expenses were paid by the personal check of Fox, and during the short period of time that the corporation did have a corporate bank account the entire balance thereof was dealt with and drawn out by Fox individually. He used the company's funds in the purchase of personal securities and investments for himself, and, at all times, claimed to be the actual owner of the company. In

view of these facts, how the defense of *ultra vires* can be made available it is difficult for me to see.  The record, to my mind, entirely disposes of this rather technical defense, so that further discussion of it seems to serve no useful purpose.

So far as the defense of undue influence and misrepresentation is concerned, no proof was offered sustaining the charge.  The defendant raised this issue by asserting it as a defense, and, of course, the burden was upon it of proving the contention.  There is an utter failure so to do.

Regarding the defense as to the discharge of the plaintiff for cause, the record is barren of any testimony justifying any such act; in fact the evidence is entirely to the contrary, and clearly shows that the defendant's breach of contract was arbitrary, unjust, and carefully planned and carried out with the deliberate intent to break the contract and leave the plaintiff to seek relief as he might be advised.  The discharge was instigated by a member of Fox's family, who wanted the plaintiff's position, and who was subsequently selected by Fox to discharge the duties of the place when plaintiff's contract was terminated.  At the time of the plaintiff's discharge he had, as the proof shows, by his personal experience and training in the newspaper business and his diligence and untiring effort, increased the circulation of the paper from 36,000 copies a week to 201,000 copies, and the publication had attained a place in the newspaper world which it never held before.  He had brought it from the depths of insolvency to the heights of solvency and it was through his efforts that the whole Fox family received substantial profit.  That they appreciated his business ability is further evidenced by the fact that although he was first employed at a salary of $125 per week, Fox voluntarily increased his compensation on more than one occasion; and in the two years and two months of his service the plaintiff was paid by way of salary and bonuses approximately $52,000, which is some evidence that he was competent to render the service called for by the contract, and that he was faithfully carrying out his **part** of the agreement when he was summarily discharged.

The plaintiff is a newspaper man, and for some fourteen or fifteen years prior to his meeting with Fox had been the sporting editor of a newspaper in Brooklyn.  Apparently he was fairly well known in the sporting world when he entered the employment of Fox in December, 1918.  His duties were to manage the various departments of the defendant, consisting of its business office, its press room, bindery, composing room, engineering and editorial departments, as well as a job printing business known as the Empire City Job Print Company, which Fox admittedly owned and

controlled. The evidence shows that at the time of his employment by Fox, the *Police Gazette*, which was a sporting paper, was in a precarious condition, financially and otherwise; and that through the plaintiff's efforts the character and tone of the paper was very much improved — its circulation was increased, its advertising columns extended and threatened bankruptcy averted.

It appears that in May, 1919, while the plaintiff's services were thus being performed, a written agreement was entered into between the plaintiff and Fox, as president of the *Police Gazette*, by the terms of which the plaintiff was employed as a manager for ten years from that date. After the making of this agreement the plaintiff took up his duties with renewed vigor, although they were the same, practically, as he had been discharging previous to the making of this written contract. There is no dispute but that the entire responsibility for the success of the business of the publication of the paper rested upon plaintiff's shoulders. Fox, himself, took no personal part in the management of the business; neither did his son, who was a resident of California. Fox was a man well advanced in years, and all he seemed to desire was financial results from the successful publication of the *Police Gazette*, the paper being a matter of family pride with him. He had owned it, he said, for fifty years, felt that it was a force in the newspaper world where it was circulated, and he wanted to perpetuate it in a financial way for the benefit of his family. That the plaintiff was successful in restoring the paper to a paying basis is amply shown by the evidence; and, in fact, it is not disputed to any extent by the defendant. Fox, evidently, was well pleased with the services of the plaintiff — so well pleased that he decided to keep plaintiff with him as long as he could; and, therefore, the making of the contract for the term of plaintiff's life was determined upon by Fox himself. As a result of the plaintiff's efforts, the circulation of the paper began to increase, the proof showing that the receipts from the sale of the paper increased during the years 1919 and 1920 from about $1,700 a week to about $9,000 a week. The proof also shows that during this time the monthly advertising receipts increased from about $1,000 a month to about $9,000 a month. And this remarkable increase in business, the evidence fairly shows, was entirely owing to the services of the plaintiff as editor and general manager of the paper in question. The proof shows that after furnishing Fox with the sum of $170,000, as proceeds of the business, and furnishing his son his salary of $52,000 a year, there still remained a balance of the proceeds amounting to $97,000, which, although asserted to be the property of the defendant corporation, was actually carried on deposit in

bank in the personal account of Richard K. Fox, and subject to his check.

With this evidence before them I think the jury were entirely justified in crediting the testimony of the plaintiff and his witnesses. On the other hand, the testimony on the part of the defendant and its witnesses was very contradictory and unreliable. Fox, himself, first denied the signing of the contract, or that he knew it was a contract for life. He denied the making and signing of the ten-year contract. He denied the meeting, or attempted meeting, of the stockholders and directors. He denied many other things, most of which, on cross-examination, he was obliged to admit; and as to each and every one of them he was contradicted by the testimony of the plaintiff and his witnesses, and also by the documentary proof submitted in the form of exhibits. It seems needless to repeat what has been said in reference to the making of the contract and the services which the plaintiff was called upon to render, and did render, pursuant thereto, to the evident satisfaction of the defendant until the time of plaintiff's dismissal from the defendant's employ. As the situation appears here, almost without dispute, the plaintiff had a perfectly good contract with the defendant, made for the term of plaintiff's natural life; that he entered upon the discharge of his duties, as called for by the contract; that he faithfully performed the obligations implied thereby for a period of about two years, and that then, the defendant, without any just cause or provocation, and largely at the instigation of a member of his family, discharged the plaintiff.

I am not aware of the existence of any rule of public policy which prohibits the making of a life contract, any more than the making of one for years; nor do I know of any statutory prohibition, either in New York or New Jersey, which, under the facts disclosed here, prohibits the making of a contract similar to the one upon which plaintiff brought his action.

I do not find any serious question of law presented here; nor do I find anything in the charge of the learned judge in submitting the case to the jury which, in any wise, tended to prejudice the rights of the defendant. And there being, to my mind, ample evidence to sustain the plaintiff's version of this case, and the award of damages made by the jury, I suggest an affirmance of the judgment and orders, with costs.

Present — KELLY, P. J., RICH, JAYCOX, MANNING and KELBY, JJ.

Judgment and orders unanimously affirmed, with costs.